**UNITED STATES of America,**

v.

**Kevin Glenn MOORE, Defendant.**

**No. 93 CR 0762.**

United States District Court, S.D. New York.

Feb. 4, 1994.

Cynthia Dunne, Asst. U.S. Atty., White Plains, NY (Southern District of NY), for plaintiff.

Joseph Vita, Port Chester, NY, for defendant.

*FINDINGS, CONCLUSIONS, & ORDER*

BRIEANT, District Judge.

By notice of motion dated December 20, 1994, defendant Kevin Glenn Moore moved to suppress all (a) items recovered from the search of a motel room in Fairview, Tennessee, pursuant to a federal search warrant and (b) evidence seized in connection with searches conducted on or about August 25 and August 26, 1993, of the defendant and of the car he was driving.[1] The defendant claims that the evidence was obtained in violation of the Fourth Amendment to the United States Constitution.

In addition, by oral motion at the evidentiary hearing held on January 20, 1994 the defendant moved to suppress an oral statement made by him on August 25, 1993 while in custody and after the defendant had asserted his right to an attorney pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[2]

---

[1] At the hearing held on January 20, 1994, defendant withdrew his motion to suppress the evidence seized from the apartment of Mary Cacciatore in White Plains, New York. That search was conducted on August 25, 1993 with her consent (see below) and the consent of her son, who resided there. *See* Gov't Exh. 7.

[2] All applications in defendant's omnibus motion dated December 20, 1993 aside from the suppression motions set forth in this order were

Moore was indicted and charged with kidnapping in violation of 18 U.S.C. § 1201(a)(1) and interstate transportation of a stolen vehicle in violation of 18 U.S.C. § 2312, arising from incidents beginning in White Plains, New York on August 23, 1993 leading to the arrest of the defendant in Fairview, Tennessee, two days later.

An affidavit for the search warrant for the motel room submitted by Federal Bureau of Investigation ("FBI") Special Agent J. Stephen Dickey ("Agent Dickey")[3] states that Moore and Ms. Cacciatore (the "victim") had been involved in a romantic relationship prior to the weekend of August 22nd, 1993. Moore visited the victim at her home in White Plains, New York, that weekend with her consent, during which time she told him that she did not wish to continue the relationship. On August 22nd, after the victim repeated that she wanted to end the relationship, Moore allegedly became enraged, pushed her face into a table at which she had been sitting, and at knifepoint, gagged and bound her with duct tape. He dragged her outside to her own 1991 Toyota Camry, locked her in the trunk and drove away from her home.

About an hour later, Moore removed the victim from the trunk and put her in the front seat of her car, after telling her that he was involved with the Mafia and the drug trade and with a "hit-man." He also said that if she tried to escape or communicate with the authorities, he would have her parents, her ex-husband, her 16–year–old son and her employer killed by making a single telephone call. Moore drove the car to Dickson, Tennessee, arriving there in the early morning hours of August 23, 1993. He checked into a motel and, among other things, forced the victim to call her employer in New York and quit her job, and to call her parents to say that she was out of town and all right.

The next day Moore rented a room for one week at the Dickson Motel in Williamson County in the city of Fairview, Tennessee, and moved the victim there. The following morning, August 25, 1993, the victim succeeded in informing a clerk in a store in a nearby town, surreptitiously, that she was in trouble. The clerk notified the police and provided a description of the car, the license plate number, and mentioned a woman with a black eye wearing sunglasses.

Shortly thereafter, the Police Chief of Fairview, Tennessee, Terry M. Harris ("Chief Harris") spotted a car in the parking lot of the Dickson Motel matching the description given by a police dispatcher over the police radio. The Police Chief and two other officers stopped the car shortly thereafter when the defendant and the victim entered the front seat of the vehicle. Moore left the automobile without resistance. The Police Chief then spoke with the woman, who said that she had been taken to Tennessee forcibly and without her consent from her home in White Plains, New York and that Moore had a weapon either in the motel room or under the front seat of the car. A search limited to the front seat was conducted immediately thereafter, and a ten or twelve inch kitchen butcher knife was found under the driver's seat. Moore was then taken into custody, read his *Miranda* rights, and driven to the local police station.

Chief Harris notified the FBI, and Special Agent Dickey took over the investigation, arriving at the police station at about noon. After interviewing officers and the victim, among others, Agent Dickey searched and photographed the car, which by then was parked in the police department parking lot. A roll of duct tape, a duffel bag, and the car's registration in the name of Mary Cacciatore were among the items found. Moore was subsequently arrested and, after refusing to sign a waiver of his *Miranda* rights, unsuccessfully sought to obtain or consult an attorney by telephone. Without being interrogated, Moore then volunteered the statement now sought to be suppressed. He said, al-

decided from the bench during the evidentiary hearing held on January 20, 1994. *See* Tr. at 1–15.

**3.** At the January 20, 1994 hearing Agent Dickey testified and I find that all of the statements in the affidavit sworn on August 26, 1993, *see* Gov't Exh. 8, were true except for a typographical error in the date on line five of the first paragraph. The correct date is August 22, 1993.

legedly, in the presence of Agent Dickey, that "This is all a misunderstanding, I treated her good." Later that day, the defendant was taken to the Williamson County Jail in Franklin, Tennessee.

The next day, the FBI obtained a search warrant for the room rented at the Fairview Motel by the defendant and recovered numerous items.

*Searches of the car*

Moore moves for an order suppressing evidence found in connection with the two searches of the victim's car. The first search, which took place in the motel parking lot shortly after the defendant left the car voluntarily but prior to his being taken into custody, was limited to the front seat. A butcher's knife matching a description given by the victim was found under the driver's seat. The second search, this time of the entire car, was conducted later that day by the FBI, after the car had been moved by the local authorities to the back of the local police station; the items seized included a roll of duct tape and a duffle bag and the registration of the vehicle in the name of Mary Cacciatore.

The defendant asserts that both searches were performed without his consent, in the absence of arrest or search warrants, and without reasonable suspicion or probable cause, and thereby evidence was obtained in violation of his rights under the Fourth Amendment of the United States Constitution.

Police Chief Harris testified as to the circumstances leading to the first search in the motel parking lot. At approximately 10:30 a.m., the Police Chief, alone in an unmarked police car, heard a dispatcher's advice to be on the lookout for a white Toyota, New York license plate number Y2W811, because a woman with a black eye covered by sunglasses had left a note in a store in the local vicinity indicating that she was in trouble. The Police Chief spotted the Toyota some 15–20 minutes later parked in a lot belonging to the Dickson Motel.

The Police Chief learned from a person repairing the parking lot pavement of the motel ("the worker") that the car belonged to a man and woman in Room 27. The Police Chief testified and I find that he wanted initially to separate Moore from Ms. Cacciatore because she was supposedly in trouble. *See* Tr. at 22, 47. Thus, after identifying himself, he obtained the cooperation of the worker to go to Room 27 and ask the man to move the car because the paving work needed to be done in that area. Before the worker could get to the room, a man and woman came up the walkway near the parking lot. The worker spoke with them and, complying with his request to move the car, they got into the front seat, with the man in the driver's seat.

Once they entered the car, one of the police officers asked the defendant to get out, which he did voluntarily, and moved him away from the Toyota to the outside of the police car. The Police Chief testified that Moore was neither frisked, patted down, restrained nor taken into custody at this point, and no weapons were displayed or used. The Police Chief then approached the passenger side, where the window was partially open, and found a woman with a black eye wearing sunglasses and otherwise matching the store clerk's description as provided by the police dispatcher. See photographs, Gov't Exh. 1(a)–(d). After the victim was reassured that he was a police officer, she revealed to him that Kevin Moore had kidnapped her at knifepoint in White Plains, New York, that he had told her that her family would be killed if she sought help, and that he wouldn't be taken alive. When asked if Moore had any weapons, she stated that he had a knife that she thought was either in the motel room or under the front seat of her car. Chief Harris testified and I find that she told him to go look in her car, up under the seat, and that he took those words as consent. *See* Tr. at 4–5.

Based on this statement, and Police Chief Harris's prior check of the license plate through motor vehicle records which confirmed that Mary Cacciatore was the owner of the car, one of the officers checked the front seat of the car and found the butcher

knife.[4] The Police Chief testified and I find that no other search of the interior of the car or of the trunk was conducted then or at any subsequent time by the local authorities. The car was left locked at the motel parking lot and Chief Harris had possession of the keys except for the period of time later in the day when he asked a police officer to bring the car to the police station. Ultimately Police Chief Harris gave the keys was FBI agent Dickey.

A second search of the car was conducted by FBI agent Dickey, who testified that he first saw the vehicle in the Fairview Police Department parking lot with its doors locked. Agent Dickey had arrived at the police department around noon. He interviewed the Police Chief and the victim, who told him, "You can search anything you want to." Tr. at 69.[5] A single roll of duct tape lodged in part under the front seat on the floor board of the back passenger side and a partially opened duffel bag, which Agent Dickey briefly checked for weapons, were in plain view in the back of the car, *see* photographs marked as Gov't Exh. 1—(e)–(i),[6] and other items including the registration of the car to Ms. Cacciatore were found.

■ To challenge the search of a car, a defendant must first show a legitimate basis for being in the car, such as permission from the owner. *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1492, 117 L.Ed.2d 633 (1992). The test for Fourth Amendment standing is whether governmental officials violated any legitimate expectation of privacy held by the person seeking to exclude the evidence obtained through the challenged search. *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978). The defendant has the burden to prove the extent to which any of the defendant's Fourth Amendment rights have been violated. *Rakas*, 439 U.S. at 131, n. 1, 133, 99 S.Ct. at 424, n. 1, 424; *United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992).

■ Based on the testimony of Police Chief Harris and FBI agent Dickey, which I find to be truthful, the two separate searches of the automobile did not violate the defendant's constitutional rights under the Fourth Amendment. The car was registered in the name of the victim, giving her the apparent authority to consent to the search. She did not give her voluntary consent to Moore to drive or be in the car. The verbal inducement by the police to get Moore into the car was not impermissibly coercive; it served the legitimate goal of protecting a woman the police had reasonable grounds to believe was the victim of on-going criminal conduct of a very serious nature. A person who secured control of a vehicle by threats of violence can hardly have a legitimate expectation of privacy with regard to its contents. *See Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 ("Obviously ... a 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified expectation of privacy, but it is not one which the law recognizes as 'legitimate.' ").

*Search of the motel room*

On August 26, 1993, the day after the victim was interviewed and Moore arrested, Agent Dickey executed a federal search warrant at Room 27 of the Dickson Motel. The defendant claims that the property seized there should be suppressed because the warrant was deficient as to probable cause to the such an extent that it is invalid and that the search cannot be saved by the "good faith"

---

4. The Police Chief testified that after the knife was found, Moore was taken into custody and his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were read to him.

5. Although written consent was not obtained from Ms. Cacciatore, she was never taken into custody and no basis appears for questioning the validity or voluntariness of her consent. Agent Dickey testified and I find that he specifically pointed out to her that he was talking about the hotel room and the car. *See* Tr. at 70.

6. The inventory took the form of a complete photographic record of everything that was found in the car.

exception under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984).

The federal search warrant was issued earlier the same day by United States Magistrate Judge William J. Haynes, Jr. (the "Magistrate Judge") on the basis of an affidavit signed by Agent Dickey and attached to the warrant. *See* Gov't Exh. 8. Prior to preparing the affidavit, Agent Dickey reviewed motel records and the registration form for Room 27 for two persons in the name of Kevin Moore. *See* Gov't Exh. 5. The affidavit states, and Agent Dickey so testified, that he interviewed "approximately five witnesses with knowledge," refers to Mary Cacciatore and to the clerk in the Dollar General Store in Dickson who called the police, and sets forth the alleged factual circumstances of the kidnapping essentially as detailed herein. Agent Dickey also testified that one of those witnesses was the victim.

■ Under the Fourth Amendment, the requirement that a neutral magistrate determine whether to issue a warrant is an important safeguard against unreasonable searches and seizures. Where that precaution is observed, as it was here, substantial weight must be given to the commonsense judgment exercised by the judicial officer. *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964); *United States v. Smith,* 9 F.3d 1007, 1012 (2d Cir.1993); *United States v. Travisano,* 724 F.2d 341, 345 (2d Cir.1983).

■ Although Agent Dickey's affidavit set forth what he learned rather than naming the witnesses or attaching either affidavits or a summary of their individual statements, the narrative provides sufficient information about alleged criminal conduct and is not so conclusory as to impair its reliability and trustworthiness. There is no suggestion that the witnesses were unavailable to the Magistrate Judge and there is no basis by which their reliability and credibility might be questioned. Paragraph 4 and the warrant itself clearly identify both the premises to be searched and the types of evidence expected to be found.

■ Even if probable cause were not spelled out in the affidavit as I find it was, the "good faith exception" to the exclusionary rule would apply here where a warrant not appearing to be deficient on its face was issued by a Magistrate Judge. There has been no showing of a lack of objective good faith by Agent Dickey or any other law enforcement officer involved, such that a "well-trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. 897, 920, 922 n. 23, 104 S.Ct. 3405, 3419, 3420 n. 23 (1984); *United States v. Smith,* 9 F.3d 1007, 1015 (2d Cir.1993). Nor is the warrant "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420.

■ The validity of the search of the motel room is further supported by the consent given by the victim, an inhabitant of the room with authority from the motel owner to be there, even if involuntarily. The day before, she told Agent Dickey, "You can search anything you want to." Tr. at 69.

■ Someone other than a suspect "may give effective consent [to a search] if she has a sufficient relationship to the property searched." *United States v. McAlpine,* 919 F.2d 1461 (10th Cir.1990) (citing *Illinois v. Rodriquez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990)). *McAlpine* held that a kidnapping victim meets this test as

a member of that class of victims who actually cohabitate with their abusers and who are not free to leave for fear of their physical or psychological well-being. Because these crime victims both sleep and carry out daily activities in the same residence with the perpetrator, they are entitled to give consent to a search of the residence in their own right. *See United States v. Matlock,* 415 U.S. 164, 171 n. 7 [, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242] (1974). And, conversely, by virtue of this mutual access, the perpetrator cannot

212

maintain a reasonable expectation of privacy in the shared property. *See id.* (other citation omitted).

*McAlpine,* 919 F.2d at 1465. The victim had a sufficient relationship to the property searched. She was present as one of two persons registered and authorized to occupy the room, she did so, and she was held against her will, afraid to leave for fear that her family and employer could be killed on the basis of a single telephone call by the defendant. The *McAlpine* case is factually undistinguishable.

I conclude that the search of the motel room did not violate the defendant's rights under the Fourth Amendment.

*The defendant's statement*

■ Defendant moves to suppress a statement made shortly after his *Miranda* rights were read to him when he was arrested at the police station. Moore refused to sign a waiver of rights until he talked with his attorney. *See* Def. Exh. B. Agent Dickey testified and I find that he stopped all interrogation from that moment. *See* Tr. at 61.

Moore was permitted to telephone his attorney. In Agent Dickey's presence, Moore placed the call and asked to speak to Michael Flannagan, his Nashville attorney. The attorney was not at his office and the defendant did not speak with a lawyer at that time. *See* Tr. at 56–57, 69. As he hung up the telephone, Moore stated, "This is all a misunderstanding, I treated her good." That is a voluntary statement, not made in response to any interrogation, which the defendant seeks to suppress.

Agent Dickey testified, no evidence to the contrary has been presented, and I find that Moore's statement was made not in response to any question initiated by Agent Dickey or any other law enforcement officer, as prohibited under *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Statements are voluntary if, as here, the accused initiates "further communications, exchanges, or conversations" with the interviewer. *Edwards,* 451 U.S. at 485, 101 S.Ct. at 1885. I find no federal constitutional grounds for suppressing Moore's statement.

*Search of the defendant*

■ Police Chief Harris testified that after the knife was recovered, he told Officer Chuck Norman to take Moore into custody, after which Moore was patted down and frisked. Nothing was taken. FBI Agent Dickey stated at the January 20, 1994 hearing that at the time of his arrest, which based on the facts and circumstances set forth above I find to have been supported by probable cause, Moore's billfold, an item that seemed like some type of carpet needle, *see* Tr. at 58, and other unidentified personal belonging were taken and turned over by the FBI to the custodian of the Williamson County Jail. This search was entirely lawful, and in any event there is no suggestion that any probative evidence intended to be used at trial was derived therefrom.

The Court concludes that all of the evidence sought to be suppressed here was properly obtained. The suppression motion is denied in all respects.

All Counsel are directed to appear at Courtroom 31, United States Courthouse, 101 East Post Road, White Plains, New York, on February 14, 1994 at 9:30 a.m. for jury selection and commencement of trial. All Counsel are instructed to submit proposed voir dire questions and exhibit and witness lists on or before February 9, 1994.

So Ordered.